ALLEN MULHOLLAND, Adm'r of the Estate of Lorene Mulholland, *et al.*, Plaintiffs-Appellees, v. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Defendant-Appellant.

Fifth District   No. 5—86—0714

Opinion filed July 7, 1988.—Rehearing denied August 4, 1988.

Dunham, Boman & Leskera, of East St. Louis (Pamela A. Klekner and John W. Leskera, of counsel), for appellant.

Bernard J. Ysursa, of Sprague, Sprague & Ysursa, of Belleville, for appellee.

JUSTICE CALVO delivered the opinion of the court:

Plaintiff, Allen Mulholland, filed a complaint for a declaratory judgment to compel the defendant, State Farm Mutual Automobile Insurance Company (State Farm), to proceed with arbitration of an underinsured motorist claim. Defendant appeals the order of the trial

court granting plaintiff's motion for summary judgment. The two issues in the case are (1) whether plaintiff's settlement with an insured tortfeasor without the written consent of defendant bars plaintiff's claim for underinsured motorist coverage, and (2) whether plaintiff must resolve his pending litigation against an insured tortfeasor before he can proceed to arbitration of the underinsured motorist claim. The second issue is only pertinent if we find in favor of plaintiff on the first issue.

An automobile driven by Dana Rudy collided with a truck driven by Donald Vance and owned by AAA Food Service, Inc., on February 16, 1982. Lorene Mulholland, Randall Mulholland, and Elizabeth Connoyer, passengers in the Rudy vehicle on the date of the collision, sustained injuries in the accident, and Lorene and Elizabeth subsequently died of their injuries. On the date of the collision, Rudy owned an Allstate Insurance Company automobile liability policy with limits of $50,000 per person and $100,000 per occurrence. AAA Food Service owned a Bolt Republican Insurance Company automobile liability policy with a single limit of $500,000 which covered its driver, Vance. Plaintiff and his wife, Lorene, owned an automobile liability policy issued by defendant that also covered their son, Randall. The policy included underinsured motorist coverage with a limit of $250,000.

Plaintiff notified defendant of a potential underinsured motorist claim on March 8, 1982. On May 12, 1982, plaintiff, as administrator of the estate of Lorene Mulholland, Cyril Connoyer, as administrator of the estate of Elizabeth Connoyer, and Randall Mulholland filed suit against AAA Food Service, Vance and Rudy. On November 12, 1982, plaintiff executed a covenant not to sue Rudy, a 16-year-old with no assets other than the Allstate insurance policy. In exchange, Rudy paid plaintiff, as administrator of Lorene Mulholland's estate, the $50,000 limit of her Allstate policy and Lorene's funeral expenses. Rudy also paid $7,500 to Randall Mulholland, and the balance of the $100,000 occurrence limit of her policy to Cyril Connoyer, as administrator of Elizabeth Connoyer's estate. The court approved the settlement. Plaintiff, however, neither notified defendant of the potential settlement nor obtained defendant's consent prior to consummating the settlement. Plaintiff notified defendant of the settlement with Rudy and of the pending suit against AAA Food Service on March 3, 1983.

On February 6, 1986, plaintiff filed a complaint for declaratory judgment which defendant subsequently answered. Plaintiff then filed a motion for summary judgment to compel arbitration of the underinsured motorist claim and to establish the policy limits of the underin-

sured motorist coverage. Defendant also filed a motion for summary judgment alleging that plaintiff's failure to obtain defendant's consent to the settlement barred plaintiff's claim, and in the alternative, that the underinsured motorist coverage did not apply until resolution of the claim against AAA Food Service. The court granted plaintiff's and denied defendant's motions for summary judgment on July 22, 1986. Defendant thereafter filed a post-trial motion requesting reconsideration of the court's summary judgment order. On September 6, 1986, the court granted defendant's post-trial motion with respect to the issue of the limits of the underinsured coverage, but denied the motion in all other respects.

Defendant argues first that plaintiff cannot claim any underinsured motorist coverage because he did not obtain defendant's written consent to the settlement with Rudy as required under the policy. Plaintiff's insurance policy with defendant provided as follows:

"We [State Farm] will pay damages for *bodily injury* an *insured* is legally entitled to collect from the owner or driver of an *underinsured motor vehicle.*

\*\*\*

THERE IS NO COVERAGE UNDER COVERAGES U [uninsured] and W [underinsured]:

1. FOR ANY *INSURED* WHO, WITHOUT OUR WRITTEN CONSENT:

a. SETTLES WITH ANY *PERSON* OR ORGANIZATION WHO MAY BE LIABLE FOR THE *BODILY INJURY*; AND

b. HURTS OUR RIGHT TO RECOVER FROM SUCH PERSON OR ORGANIZATION." (Emphasis in original.)

The trial court found that "such provisions are reasonable and enforceable in order that insureds not jeopardize an insurer's subrogation rights." The court went on to hold, however, that plaintiff's actions did not "hurt" defendant. Thus, according to the court, the second part of the two-part test in the policy provision was not fulfilled, and therefore, plaintiff's underinsured claim was not barred.

The court stated that the meaning of the word "hurt" in the policy was unclear. Because the court found that "hurt" was ambiguous, it held that the term should be "construed strictly against \*\*\* State Farm." (See *Dora Township v. Indiana Insurance Co.* (1980), 78 Ill. 2d 376, 379, 400 N.E.2d 921, 922.) The court found that the settlement did not hurt defendant, because plaintiff settled with a 16-year-old tortfeasor for the limits of her insurance coverage. Defendant argued, however, that because Rudy owned some insurance, she at least

appeared to be in a better financial position than an uninsured tortfeasor. Defendant argued further that the settlement with Rudy hurt plaintiff's potential recovery from AAA Food Service because the party primarily at fault—Rudy—would be excluded from the suit. Defendant contended that if Rudy was included in the suit, under the theory of joint and several liability plaintiff could collect the full amount of the judgment from AAA Food Service even if it was found to be only 1% negligent. Nevertheless, the court held that plaintiff's failure to obtain consent did not hurt defendant because the "parties [did] not dispute, and there [was] nothing in the record to indicate that the 16-year-old had any other assets than her automobile insurance policy."

■ A party is entitled to summary judgment "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Ill. Rev. Stat. 1985, ch. 110, par. 2—1005 (c).) The court should deny summary judgment if it

> "is presented with any set of facts about which reasonable men might disagree, *** and [if] *** the facts although not in dispute, are subject to conflicting inferences and the parties disagree as to what their intention was as shown by the facts." (*Lesser v. Village of Mundelein* (1975), 36 Ill. App. 3d 433, 437, 344 N.E.2d 29, 33.)

We find that there was no genuine issue of material fact on the issue of consent, and therefore, the trial court properly entered summary judgment in favor of plaintiff.

■ We, like the trial court, fail to see how defendant was "hurt" or prejudiced by the settlement. Plaintiff settled with Rudy for the limits of her insurance policy. Moreover, there was no evidence in the record that Rudy had any other significant assets. Defendant argues that because Rudy owned some insurance she appeared to be in a better financial position than an uninsured tortfeasor. Defendant, however, failed to show that Rudy *actually* was in a better position; that is, that she had other assets from which to collect a judgment.

Defendant contends that it was also prejudiced by the settlement because the settlement destroyed its subrogation rights against Rudy. Defendant states that the value of plaintiff's claim in a trial against all three tortfeasors would be higher than in a trial against only Vance and AAA Food Service. Defendant asserts that discovery revealed that Rudy was primarily at fault. Thus, according to defendant, the entire verdict could be collected from Vance and AAA Food

Service under the theory of joint and several liability, even if they are found to be only 1% negligent. Because Vance's and AAA Food Service's policy limit of $500,000 is well above plaintiff's $250,000 underinsured coverage limit, defendant contends that plaintiff's entire claim could be collected elsewhere without resort to the underinsurance coverage.

Defendant's argument, however, sidesteps the fact that its subrogation rights against Rudy survived the settlement. It is true that even though defendant has not yet made any payment to plaintiff under the policy, defendant's subrogation rights need not presently exist in order for those rights to be prejudiced. (*Gattorna v. American States Insurance Co.* (1984), 122 Ill. App. 3d 582, 588, 461 N.E.2d 675, 679.) Our supreme court, however, has held that

> "an unlimited release executed by an insured-subrogor for consideration not specifically including an amount designated as covering the insurer's subrogation interest does not bar a subsequent subrogation action by an insurer-subrogee against the tortfeasor, if the tortfeasor or his insurance carrier had knowledge of the insurer-subrogee's interest prior to the release." (*Home Insurance Co. v. Hertz Corp.* (1978), 71 Ill. 2d 210, 215, 375 N.E.2d 115, 118.)

We initially note that, according to the record, the settlement payment did not specifically include an amount designated as covering any subrogation interest defendant possessed.

■ The essential issue, therefore, is whether Allstate or Rudy received notice of defendant's subrogation rights. The record reveals that Allstate received knowledge of defendant's subrogation interest prior to the settlement. On October 12, 1982, prior to payment of the settlement, plaintiff's counsel sent Allstate a letter with an attached copy of an insurance policy. The letter contained the following heading: "re Allen Mulholland, No. 2619314301 (Rudy's Allstate Insurance policy number)." The letter then stated: "Enclosed please find copy of policy per your request." The letter, however, did not specifically identify the attached policy as plaintiff's State Farm policy. Plaintiff argues that the court can infer that Allstate received the State Farm policy because that policy was the only one in plaintiff's possession relating to the accident in question. Defendant argues that plaintiff is improperly supplementing the record because the letter does not appear in the record. Defendant also argues that plaintiff did not raise this particular defense at trial so it is waived. Defendant finally contends that plaintiff presented no evidence that Allstate actually received the policy.

We initially hold that plaintiff did not improperly supplement the record. Our review of the record revealed that a copy of the letter appears on page 183. We also hold that plaintiff did not raise a new issue or defense, but simply asserted another argument to support its position that defendant was not prejudiced. Thus, plaintiff did not waive this argument. Finally, we hold that the letter provided sufficient evidence that Allstate received notice of defendant's subrogation interest. No other inference can be drawn from the letter. The only other insurance policies relevant to the Mulholland and Rudy accident (to which the heading of the letter refers) are Allstate's policy with Rudy and Bolt's policy with AAA Food Service. Certainly Allstate did not need a copy of the policy it had with its own insured. Moreover, if Allstate wanted a copy of AAA Food Service's policy it would have requested a copy of the policy from AAA Food Service's attorney. Plaintiff did not have to show that Allstate actually received the policy. A letter properly sent through the mails is presumed to have reached its destination. (*City of Chicago v. Supreme Savings & Loan Association* (1975), 27 Ill. App. 3d 589, 592, 327 N.E.2d 5, 7.) The presumption stands unless the recipient denies receipt of the letter. (*City of Chicago*, 27 Ill. App. 3d at 592, 327 N.E.2d at 7.) Defendant in the case at bar did not show that Allstate denied receiving the letter and the attached policy. Consequently, the only conclusion that we can reach is that Allstate received notice. Because Allstate received notice of defendant's interest, defendant's subrogation rights survived the settlement. As a result, defendant was not prejudiced by the settlement.

We additionally note that even if plaintiff had requested defendant's consent to the settlement, defendant could not have unreasonably or arbitrarily withheld its consent. (*Levy v. American Automobile Insurance Co.* (1961), 31 Ill. App. 2d 157, 175 N.E.2d 607; *Andeen v. Country Mutual Insurance Co.* (1966), 70 Ill. App. 2d 357, 217 N.E.2d 814, *cert. denied* (1967), 385 U.S. 1036, 17 L. Ed. 2d 682, 87 S. Ct. 775.) Under the circumstances in the case at bar, we hold that defendant's refusal to consent would have been unreasonable or arbitrary, especially inasmuch as Rudy tendered the limits of her policy and defendant's subrogation rights survived the settlement.

Defendant relies on *Tuthill v. State Farm Insurance Co.* (1974), 19 Ill. App. 3d 491, 311 N.E.2d 770. That case involved a similar consent provision regarding uninsured coverage. The provision read as follows:

"Insuring Agreement III does not apply: (a) to bodily injury to an insured, or care or loss of services recoverable by an in-

sured, with respect to which such insured, his legal representative or any person entitled to payment under this coverage shall, without written consent of the company, make any settlement with any person or organization who may be legally liable therefor ***." (*Tuthill,* 19 Ill. App. 3d at 493, 311 N.E.2d at 772-73.)

The court in *Tuthill* found that the words of the provision were clear and unambiguous and held that the provision was valid and enforceable. (*Tuthill,* 19 Ill. App. 3d at 498-99, 311 N.E.2d at 776.) We hold, likewise, that the provision in the case at bar is valid and enforceable, but we also believe that *Tuthill* is distinguishable in one important aspect. The policy in *Tuthill* did not include the additional language found in plaintiff's policy in the case at bar; namely, that the settlement must hurt the insurer for coverage to be excluded. In addition, although the court in *Tuthill* held that the insurer was not required to show some prejudice before it claimed the benefit of the exclusion (*Tuthill,* 19 Ill. App. 3d at 501, 311 N.E.2d at 778), recent Illinois decisions have held to the contrary where the policy is silent on the subject of prejudice. *Marsh v. Prestige Insurance Group* (1978), 58 Ill. App. 3d 894, 897, 374 N.E.2d 1268, 1270; see *M. F. A. Mutual Insurance Co. v. Cheek* (1977), 66 Ill. 2d 492, 499-500, 363 N.E.2d 809, 813.

Defendant also relies on *Boyd v. Madison Mutual Insurance Co.* (1986), 146 Ill. App. 3d 420, 496 N.E.2d 555, which we find inapplicable. The sole issue in *Boyd* was whether section 143a—2(7) of the Illinois Insurance Code (Ill. Rev. Stat. 1985, ch. 73, par. 755a—2(7)) applied retroactively. That statute provided that the insurer lost its subrogation rights if it received advanced written notice of the settlement and refused to advance the insured an amount equal to the tentative settlement within 30 days. In *Boyd,* the tortfeasor tendered to plaintiff the limits of his insurance policy for injuries plaintiff received in an automobile collision with the tortfeasor. The settlement required plaintiff to execute a release of liability. Plaintiff had underinsured coverage with her insurer, and the policy gave the insurer subrogation rights and required the plaintiff to do nothing to prejudice those rights. Pursuant to the statute, plaintiff demanded payment from the insurer in an amount equal to the settlement offer and defendant refused. The policy did not specifically require written consent to the settlement as does the policy in the case at bar. Moreover, the parties did not dispute that execution of the release would have jeopardized the insurer's rights and that the insurer had expressly refused to waive its rights. Thus, neither of those issues was before the *Boyd* court.

■ Defendant, citing *Wooding v. L & J Press Corp.* (1981), 99 Ill. App. 3d 382, 425 N.E.2d 1055, also argues that plaintiff failed to contradict the facts set forth in defendant's verified motion for summary judgment, and therefore, defendant is entitled to summary judgment. *Wooding* is distinguishable from the case at bar. In that personal injury case, the court upheld summary judgment for defendant. Defendant was the only party to move for summary judgment, and the facts at issue were those sworn to in an affidavit attached to defendant's motion. Plaintiff only filed a motion to defer the proceedings which was unsupported by affidavits. Because plaintiff failed to contradict the facts in defendant's affidavit which established that defendant was not the proximate cause of the injury, the court granted defendant's motion. In the case at bar, both parties filed for summary judgment and the court heard oral arguments on both motions on the same day. In addition, defendant alleged certain facts and conclusions in its motion. It did not attach any affidavits to its motion supporting these facts. Although a summary judgment motion may be granted without supporting affidavits, "[o]nly facts offered in affidavit form will be considered in support of such motion." (*Cato v. Thompson* (1980), 83 Ill. App. 3d 321, 324, 403 N.E.2d 1239, 1242.) Consequently, we reject defendant's position on this issue.

■ Aside from arguing that defendant was not prejudiced by the settlement, plaintiff also contends that defendant waived application of the consent provision because plaintiff notified it of a potential underinsured motorist claim on March 8, 1982, and notified it of the settlement with Rudy on March 3, 1983, but defendant did not invoke or claim privilege under the provision until it filed its answer to the complaint for declaratory judgment three years later on March 31, 1986. In its correspondence after the settlement, defendant continued to invoke the exhaustion clause in the policy (which we discuss later in this opinion), but remained silent with respect to the consent issue. The trial court concurred with plaintiff's position and found that defendant waived application of the provision.

Waiver arises from an affirmative act of the defendant, not by operation of law; it is the intentional relinquishment of a known right. (*Western Casualty & Surety Co. v. Brochu* (1985), 105 Ill. 2d 486, 499, 475 N.E.2d 872, 878.) A waiver can be expressed or implied by the acts, words, conduct or knowledge of the defendant. (*Brochu*, 105 Ill. 2d at 499, 475 N.E.2d at 878.) Prejudicial reliance by plaintiff is not required. (*Brochu*, 105 Ill. 2d at 499, 475 N.E.2d at 878.) Plaintiff contends that defendant had discretion to invoke the consent provision. Because defendant invoked the provision three years after notice

of the settlement, plaintiff argues that defendant's failure to invoke the provision constituted bad faith in its exercise of that discretion. See *Foster Enterprises, Inc. v. Germania Federal Savings & Loan Association* (1981), 97 Ill. App. 3d 22, 30, 421 N.E.2d 1375, 1380 ("Good faith between contracting parties requires that a party vested with contractual discretion must exercise his discretion reasonably ***").

Although plaintiff's argument has merit, we hold that defendant did not waive its lack-of-consent-to-settle defense. "Strong proof is not required to show a waiver of a policy defense, but only such facts as would make it unjust, inequitable or unconscionable to allow the defense to be interposed." (*Kenilworth Insurance Co. v. McDougal* (1974), 20 Ill. App. 3d 615, 620, 313 N.E.2d 673, 677.) In addition, "while a long delay without explanation in asserting a policy defense *** is normally not enough to constitute *** waiver, *** the length of delay is an element in determining the reasonableness or fairness of the insurer's conduct toward the insured." (*Kenilworth*, 20 Ill. App. 3d at 620, 313 N.E.2d at 677.) We do not believe that defendant's long delay in asserting its defense was unconscionable or unfair to plaintiff. Defendant did not assert the lack-of-consent-to-settle defense until it answered the complaint for declaratory judgment. Nevertheless, during the three years prior to the suit, defendant continued to deny application of the underinsured coverage on the basis of the exhaustion clause in the policy. Thus, plaintiff knew that defendant was contesting the underinsured coverage, although defendant was doing so on other grounds. For this reason, defendant's delay in asserting the lack-of-consent-to-settle defense did not amount to an implied waiver of the defense. Although we hold against plaintiff on this basis, we have already held for plaintiff on this consent to settle issue on other grounds. (See *Thornton v. Williams* (1980), 89 Ill. App. 3d 544, 549, 412 N.E.2d 157, 161 ("[T]he judgment of the court below will be affirmed if it is justified in the law for any reason or ground appearing in the record regardless of whether the particular reasons given by the trial judge, or his specific findings, are correct or sound").) Consequently, we affirm the trial court's order with regard to the consent to settle issue.

■ The second issue defendant raises concerns the validity and enforceability of the policy provision, known as the exhaustion clause, which requires plaintiff to reduce all claims against potential tortfeasors to a judgment or settlement before arbitration can take place on the underinsured motorist coverage. The exhaustion clause provides:

"THERE IS NO COVERAGE UNTIL THE LIMITS OF LIA-
BILITY OF ALL BODILY INJURY LIABILITY INSURANCE
POLICIES OR BONDS THAT APPLY TO THE *INSURED'S
BODILY INJURY* HAVE BEEN USED UP BY PAYMENT OF
JUDGMENTS OR SETTLEMENTS." (Emphasis in original.)

Plaintiff, on appeal, adopted the position of the trial court. The trial
court found that the word "apply" as used in the policy was ambigu-
ous and therefore construed the meaning of the term in favor of the
insured. (See *Dora*, 78 Ill. 2d at 379, 400 N.E.2d at 922.) The court
stated that whether other insurance policies apply in any given case
was unclear. The policy did not define the term, nor did it provide for
arbitration of the issue in the event the insured and the insurer dis-
agreed over when a particular policy applied. The court pointed out
that an insured could be forced to file and pursue a suit against a po-
tential tortfeasor even after the insured discovered that a finding of
liability against a particular tortfeasor would be highly unlikely. As
the court noted:

> "The practical effect of defendant's argument is that a plain-
> tiff/insured who files suit initially naming every potential
> defendant to an accident, makes the determination that each of
> those defendant's insurance policies 'apply' regardless of the
> outcome of subsequent discovery and the realistic likelihood of
> recovery therefrom. An aggressive plaintiff/insured who uses
> the 'shotgun' approach in the filing of his lawsuit thereby pro-
> tecting not only his rights, but also the subrogation rights of
> the insurer, is therefore penalized enabling a silent insurer to
> avoid arbitration. A less aggressive plaintiff/insured who sues
> fewer than all the potential defendants to an accident, runs the
> risk of violating the insurer's subrogation rights. Under such a
> theory, it would behoove a carrier to remain silent, as was the
> case herein."

The court went on to state that discovery had revealed that Rudy was
primarily at fault and that the likelihood of a judgment against AAA
Food Service and Vance was slim. The court then pointed out:

> "If the plaintiff had not filed suit quickly using the shotgun ap-
> proach, but rather thoroughly investigated the aforesaid facts
> and determined that there was no viable cause of action against
> AAA Food Service and its driver and, therefore, only sued the
> driver of plaintiff's vehicle, could it be said that plaintiff was
> wrong? Even at this state, if plaintiff chose to voluntarily dis-
> miss his cause of action against AAA Food, would it be said
> that this decision would be incorrect? I think not."

The court concluded that a fair standard to determine if other liability policies "apply" to an accident was

"whether or not the insurer could show by a preponderance of the evidence that a reasonably viable cause of action by the insured against some person or entity other than the underinsured exists. The fact that the insured has sued such other person is not conclusive on the viability of such a cause."

The court then found that plaintiff did not have a reasonably viable cause of action against AAA Food Service or Vance and, therefore, held in favor of plaintiff on this issue.

Defendant argues that the language of the provision is clear and unambiguous. Defendant contends that a policy applies to an accident if it is in effect on the date of the accident and if it insures an alleged tortfeasor. Defendant states that underinsured coverage is excluded until a determination is made that all potentially culpable tortfeasors cannot compensate the injured party. A determination of the adequacy of insurance cannot be made until the court renders a judgment or the parties settle the suit because, according to the policy, the amount of underinsured coverage available is directly affected by settlements with or judgments against the responsible parties:

"The most we pay will be the lesser of:

a. the difference between the amount of the *insured's* damages for *bodily injury* and the amount paid to the insured by or for any person or organization who is or may be held legally liable for the *bodily injury*; or

b. the limits of liability of this coverage." (Emphasis in original.)

Defendant contends further that the policy provision in question does not require a judgment against or settlement with every possible tortfeasor, but only requires that plaintiff in the case at bar reduce to judgment or settlement the claim which he voluntarily filed and has pending against AAA Food Service and Vance. Defendant alleges that plaintiff could settle the suit for nuisance value, obtain summary judgment, or obtain a sizeable judgment. Until the suit is resolved, however, defendant claims that the amount, if any, of underinsured coverage cannot be determined. Defendant contends that under the theory of joint and several liability, even if AAA Food Service and Vance are found 1% negligent, plaintiff could collect the full amount of the judgment from them. Defendant argues that its position is in line with the purpose of underinsurance, which is to protect the insured against the risk of recovering less from an insured tortfeasor than would have been recoverable from an uninsured tortfeasor under the statutorily

required uninsured motorist protection, rather than to protect an insured against the risk of uncompensated damages. *Price v. State Farm Mutual Automobile Insurance Co.* (1983), 116 Ill. App. 3d 463, 468, 452 N.E.2d 49, 53.

Defendant also asserts that it would not be able to meet the trial court's preponderance standard because defendant is not a party to the suit and could not otherwise get the information necessary to prove the case. Defendant argues that under the trial court's theory the insured could settle with the tortfeasor with the lowest liability policy limits and then seek arbitration to collect the remainder of his or her claim from his or her underinsured motorist coverage. The effect, defendant contends, would be that insurers would have to file subrogation actions against the remaining tortfeasors and thus bear the brunt of the expenses attributable to the insureds' suits. Arbitration would, therefore, substitute as the primary source of injured parties' recovery, with the insurance companies financing personal injury suits through subrogation actions.

Although we agree with the trial court's analysis of the problems inherent in the exhaustion clause, we decline to adopt the trial court's resolution of the situation. The trial court held that only in cases where the "insurer could show by a preponderance of the evidence that a reasonably viable cause of action by the insured against [the insured tortfeasor] exists" will the insured have to settle or prosecute his or her claim to judgment before seeking the underinsured coverage. This approach presents two problems. First, it forces the court to pretry the case and rule on the merits of the claim prior to trial, thus subverting the parties' right to the benefits of a full trial. Second, the burden on the courts would increase because the parties would continually resort to the courts for a determination of whether the preponderance standard was met. Moreover, the courts would have to establish what constitutes a "reasonably viable cause of action."

A review of Illinois case law reveals only one case that has directly addressed this issue. In *Wilhelm v. Universal Underwriters Insurance Co.* (1978), 60 Ill. App. 3d 894, 377 N.E.2d 62, plaintiff was involved in an automobile accident with two tortfeasors, one uninsured and one insured. The trial court barred arbitration of plaintiff's uninsured motorist claim until plaintiff completed its pending litigation against the insured tortfeasor. The appellate court reversed that portion of the trial court's order and stated:

"One of the prime purposes of an agreement to arbitrate is to enable the parties to secure a speedy determination of the dif-

ferences between them without conforming to the strict formalities necessary in a court of law. [Citation.] This purpose would be completely defeated by the trial court's order barring the arbitration to which the plaintiff is entitled, by the policy's own provisions, until such time as the claim against [the insured tortfeasor] is finally determined, perhaps years from now. \*\*\*

Furthermore, there is nothing in the statute indicating that the insurance required by the statute was to be available only if no other source of recovery were available. To the contrary, the statute provides that the insurer, having paid the claim, is entitled to recover, to the extent of such payment, out of the proceeds of any settlement or judgment against any person legally responsible for the injury. If the insurer is not required to pay until after all other possible sources of recovery have been exhausted, this provision would be meaningless. \*\*\*

Additionally, nearly every jurisdiction which has considered this issue has agreed that the insured cannot be forced to wait until the liability of an alleged joint tortfeasor has been litigated before recovering under the uninsured motorist coverage. [Citations.]" (*Wilhelm*, 60 Ill. App. 3d at 899-900, 377 N.E.2d at 66.)

(See *Gentry v. City Mutual Insurance Co.* (1978), 66 Ill. App. 3d 730, 732-33, 384 N.E.2d 131 (quoting this language and following the holding of *Wilhelm*).) *Wilhelm* involved uninsured rather than underinsured coverage, and the policy itself did not include an exhaustion clause. The *Wilhelm* court, however, refused to imply the requirements of the exhaustion clause into the policy or the statute. Thus, the case at bar questions for the first time the validity of an exhaustion clause that is expressly part of an insurance policy.

Other States have dealt with the exhaustion clause issue. Some States have held that the insured could proceed to arbitrate his or her uninsured claim even though one of the alleged joint tortfeasors was insured. (*Sowell v. Travelers Indemnity Insurance Co.* (1974), 31 Conn. Supp. 413, 332 A.2d 792; *Motorists Mutual Insurance Co. v. Tomanski* (1971), 27 Ohio St. 2d 222, 271 N.E.2d 924; *O'Brien v. Aetna Casualty & Surety Co.* (1970), 33 A.D.2d 1085, 307 N.Y.S.2d 689; *Tholen v. Carney* (5th Cir. 1977), 555 F.2d 479.) In a similar vein, Florida courts have held that a policy provision "which requires that the insured must pursue the uninsured-underinsured motorist to a judgment or settlement prior to proceeding against its own insurer" was unenforceable. (*Liberty Mutual Insurance Co. v. Reyer* (Fla. App. 1978), 362 So. 2d 390, 391-92; see *Arrieta v. Volkswagon Insurance*

*Co.* (Fla. App. 1977), 343 So. 2d 918.) The only difference in *Reyer* was that the insured had not settled with or obtained a judgment against the uninsured-underinsured tortfeasor, whereas in the case at bar plaintiff has not obtained a settlement with or judgment against the insured joint tortfeasor.

Minnesota has held that an exhaustion clause, identical to the one in the case at bar, was void as against the public policies of the State's "No-Fault Automobile Insurance Act." (*Schmidt v. Clothier* (Minn. 1983), 338 N.W.2d 256, 261.) The *Schmidt* court explained:

> "The first issue raised is whether policy exhaustion clauses are enforceable. Both underinsurance policies in these cases contained an exhaustion clause which provided: 'We will pay under this coverage only after the limits of liability under any applicable bodily injury bonds or policies have been exhausted by payment of judgments or settlements.' \*\*\*
>
> \*\*\*
>
> The purposes of the no-fault act \*\*\* include \*\*\* easing the burden of litigation and encouraging prompt payment of claims. Enforcement of policy exhaustion clauses would produce results contrary to those purposes. It could serve to force an insured to litigate the claim to final judgment in order to exhaust the policy limits. Litigation expenses would lessen the insured's net recovery, the time involved in litigation would serve to delay payment to the insured, and the litigation itself would unnecessarily burden our court system. Where the best settlement available is less than the defendant's liability limits, the insured should not be forced to forego settlement and go to trial in order to determine the issue of damages. The insured has the right to accept what he or she considers the best settlement available and to proceed to arbitrate the underinsurance claim for a determination of whether the damages do indeed exceed the tortfeasor's liability limits. Thus, we hold that exhaustion clauses are void as against the policies of the no-fault act. The insured may recover underinsurance benefits where the total damages sustained (as determined by either arbitration or judgment) exceed the limits of the tortfeasor's liability policy even where the insured settles with the tortfeasor for less than the liability limits." (*Schmidt*, 338 N.W.2d at 260-61.)

One commentator has opined that the Illinois Appellate Court's decision in *Wilhelm* probably rendered exhaustion clauses unenforceable in Illinois. Comment, *Ohio Underinsured Motorist Coverage: Reconciling the Consent-to-Settle and Exhaustion Clauses*, 12 Ohio N.U.L.

Rev. 17, 27-28 (1985) (hereinafter *Exhaustion Clause*).

A New York court dealt with a scenario similar to the one in the case at bar. In *Colonial Penn Insurance Co. v. Salti* (1982), 84 A.D.2d 350, 446 N.Y.S.2d 77, the Saltis were passengers in an automobile owned by Max Rayner and operated by Ellen Rayner. The Rayners owned a Liberty Mutual policy with liability limits of $100,000/$300,000. The Saltis owned a Colonial Penn Insurance Company policy with underinsured motorist limits of $15,000/$30,000. The Salti/Rayner vehicle collided with an automobile owned by Michael Petryszyn and operated by Eugene Petryszyn. The Petryszyns owned, an Allcity Insurance Company policy with limits of $10,000/$20,000. Prior to trial, the Saltis settled with the Petryszyns for $20,000, their policy limit, and with the Rayners for $125,000, well under their policy limit. The Saltis thereafter sought arbitration to recover $15,000 each under their underinsured coverage. Colonial denied coverage because the Saltis, by settling for less than the Rayner's policy limits, had not exhausted the limits of liability of all the policies applicable at the time of the accident.

The court first noted that the exhaustion clause in the policy must be read in conjunction with the paragraph which defines an underinsured highway vehicle. In construing the two paragraphs together, the court found that the exhaustion clause only applied to the underinsured vehicle, not to the total number of vehicles involved in the accident. The court continued:

> "To interpret the insuring agreement so that the insurer's obligation to pay becomes operative only after *all* insurance applicable to *all* vehicles involved in the accident is exhausted, as Colonial contends, would emasculate the endorsement's intended effect as construed by Florida courts, to provide coverage over and above the limits of the tort-feasor's insurance. [Citations.] If Colonial's interpretation were accepted, the endorsement would be inoperative except in the instances of a single-car accident involving an underinsured vehicle or the multiple-car accident where the aggregate applicable insurance is less than the limits of Colonial's policy. The indorsement would be inapplicable as long as any vehicle involved in the accident was covered with liability limits in excess of the Saltis' coverage. It would not matter that the party responsible for the operation of such vehicle might not be liable for the accident. Obviously, such a result was never intended, and this case illustrates the point.

The Rayners had applicable to this accident automobile lia-

bility insurance, the aggregate of which was 10 times the aggregate of the Saltis' coverage. Yet, notwithstanding the applicability of this relatively high-limit coverage, had the Saltis proceeded to trial against the Rayners, a distinct possibility existed that on the facts presented the Rayners might avoid liability altogether, in which event their insurer would not be obliged to pay any part of the damage award. Obviously, in that event, the Saltis, whose damages appear to be far in excess of the $10,000/$20,000 insurance provided by the Petryszyns' policy, would nonetheless be confronted with an underinsured accident, since the Petryszyns' coverage is less than the $15,000/$30,000 limit of the Saltis' underinsured motorist endorsement." (Emphasis in original.) *Salti*, 84 A.D.2d at 353-54, 446 N.Y.S.2d at 79-80.

The court also found that its decision was not affected by the Saltis' settlements. Although Colonial Penn argued that the $145,000 settlement constituted the Saltis' full amount of damages and that the Saltis should not recover any more money under their underinsured coverage, the court noted that the amount of the settlement was not determinative of the amount of damages the Saltis sustained. The court stated further:

"It is obvious from the injuries suffered by each of the Saltis that the $145,000 settlement did not represent the full measure of their damages. As the record discloses, the Saltis settled their action to avoid the rigors and inconvenience which a trial, at their advanced age, would have posed, and the distinct possibility that the outcome of such a trial would have been a judgment substantially uncollectible, against the underinsured Petryszyns, who were primarily, if not solely, responsible for the accident." (*Salti*, 84 A.D.2d at 354, 446 N.Y.S.2d at 80.)

Thus, the court held that "the Petryszyn vehicle was an underinsured highway vehicle as to which the limits of all liability insurance applicable to its use at the time of the accident have been exhausted" (*Salti*, 84 A.D.2d at 354, 446 N.Y.S.2d at 80), and the court allowed the Saltis to proceed with arbitration of their underinsured coverage.

■■ Thus, based on *Wilhelm* and the support of other jurisdictions, we hold the exhaustion clause in the case at bar which provides that an insured receive no coverage until the limits of liability of all applicable insurance policies have been used up by payment of judgments or settlements is against public policy and therefore unenforceable. In the case at bar the policy itself provides State Farm with subrogation rights and provides that State Farm shall be repaid its

"payments, costs, and fees of collection out of any recovery." As the *Wilhelm* court pointed out, "[i]f the insurer is not required to pay until after all other possible sources of recovery have been exhausted, (repayment rights) would be meaningless." (*Wilhelm*, 60 Ill. App. 3d at 900, 377 N.E.2d at 66.) Likewise, subrogation rights would be virtually unnecessary if the exhaustion clause was enforced. Subrogation rights allow insurers to take the place of their insureds to recover from the tortfeasors any payments the insurers made to their insureds under the policy. If insureds are forced to obtain judgments or settlements prior to collecting their underinsured benefits, insurers would have very little need for subrogation rights. Furthermore, the statute does not indicate that the insured can recover only if no other recovery is available. (See *Wilhelm*, 60 Ill. App. 3d at 899, 377 N.E.2d at 66.) On the contrary, the exhaustion clause restricts coverage that is otherwise mandated by the statute. See *Exhaustion Clause*, 12 Ohio N.U.L. Rev. at 26; Ill. Rev. Stat. 1985, ch. 73, par. 755a—2.

■ In addition, the State Farm policy provides for arbitration in the event State Farm and its insured disagree over (1) whether the insured is legally entitled to recover from the owner or driver of the underinsured vehicle, and (2) if the insured is entitled to recover, the amount of such recovery. As the *Wilhelm* court noted, the purpose of arbitration is to "secure a speedy determination of the differences between" the parties, and this purpose would be thwarted if "the arbitration to which the plaintiff is entitled, by the policy's own provisions, [is barred] until such time as the claim against [the insured tortfeasor] is finally determined, perhaps years from now." (*Wilhelm*, 60 Ill. App. 3d at 899, 377 N.E.2d at 66.) The litigation would also only serve to increase the burden on the courts and to delay payment of claims. (See *Schmidt*, 338 N.W.2d at 260-61.) Moreover, State Farm would not be hurt by arbitration of the claim. If plaintiff pursues the suit, State Farm would recover out of the judgment any payment it makes to plaintiff. If plaintiff does not wish to pursue the suit, he would have to preserve State Farm's subrogation rights and State Farm could thus prosecute the claim and receive recovery for its payment out of the judgment.

■ Defendant is correct that AAA Food Service's joint liability might preclude the underinsured coverage. Defendant fails to point out, however, that AAA Food Service may not be liable at all for plaintiff's injuries. If AAA Food Service is not liable, its insurer would not be required to compensate plaintiff for any portion of the damages. (See *Salti*, 84 A.D.2d at 354, 446 N.Y.S.2d at 80.) Thus,

plaintiff's underinsured coverage would apply. Moreover, at least one court has held that even if an insured obtains a judgment against two joint tortfeasors, one of which is insured, and even if the insured can collect the entire judgment from the insured joint tortfeasor, the insurer is liable through its uninsured coverage for the sums which its insured is entitled to recover from the insured joint tortfeasor. (See *Tholen*, 555 F.2d at 480-81; but see *Scharfschwerdt v. Allstate Insurance Co.* (Fla. App. 1983), 430 So. 2d 578.) Nevertheless, plaintiff should not be required to pursue a suit which he feels may be worthless. Plaintiff's policy provides for arbitration concerning the extent of Rudy's liability and plaintiff's recovery, and plaintiff is entitled to rely on arbitration rather than pursue a costly lawsuit.

Defendant's other contentions are also without merit. Defendant is correct that the extent, if any, of underinsured coverage is affected by the amount of plaintiff's damages and the payments paid to plaintiff by the liable tortfeasors. Nevertheless, as we have pointed out, plaintiff's damages and the liability of the underinsured tortfeasor can be determined not only by a judgment, but also by arbitration. Defendant also asserts that it is only asking for plaintiff to resolve this particular suit against AAA Food Service, a suit which plaintiff voluntarily filed. We agree with the trial court, however, that a plaintiff, in order to protect the insurer's subrogation rights, must file suit against every potential tortfeasor. Only after discovery can the insured determine which tortfeasor may be liable. Although defendant notes that plaintiff could settle the suit or obtain a sizeable judgment, plaintiff may also be forced to take an unsuccessful suit to trial, especially if AAA Food Service believes that it could obtain a favorable judgment. In the meantime, the amount of underinsured coverage, if any, can be determined through arbitration.

Defendant finally contends that insurers will be forced to bear the burden of their insureds' suits because the insureds will simply settle with the tortfeasor with the lowest liability policy limits and then resort to arbitration. Defendant, however, overlooks the fact that under the policy an underinsured motor vehicle is one "whose limits of liability for bodily injury liability are not adequate to pay the *insured* for his or her damages." (Emphasis in original.) Thus, as long as one of the vehicles involved in an accident does not have insurance adequate enough to cover the injured party's damages, the injured party could settle with the underinsured and proceed to arbitration. Contrary to defendant's argument, however, an injured party could not just settle with the tortfeasor with the lowest liability policy limits, because even though that tortfeasor may have the lowest limits, he or she may still

have liability limits sufficient to pay the injured party's damages. Therefore, we believe our decision balances the rights of the insurer with those of the insured as contemplated by the statute and the policy.

For the foregoing reasons, we affirm the decision of the circuit court of St. Clair County.

Affirmed.

WELCH and KARNS, JJ., concur.