**Jennifer RADIL, Cross–Claim Plaintiff–Appellant,**

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, Cross–Claim Defendant–Appellee.**

No. 07CA1534.

Colorado Court of Appeals, Div. IV.

Oct. 16, 2008.

Roberts Levin Rosenberg, P.C., Thomas L. Roberts, Michael J. Rosenberg, Zachary C. Warzel, Denver, Colorado, for Cross–Claim Plaintiff–Appellant.

Treece, Alfrey, Musat & Bosworth, P.C., Carol L. Thomson, Denver, Colorado, for Cross–Claim Defendant–Appellee.

Opinion by Judge ROY.

Jennifer Radil (the plaintiff) appeals the trial court's summary judgment in favor of National Union Fire Insurance Company of Pittsburgh, Pennsylvania (the insurer) regarding her claim for underinsured motorist (UIM) benefits for injuries she suffered as a passenger in a car accident. We vacate the judgment and remand for further proceedings.

In the summer of 2000, the plaintiff worked as an assistant counselor at a summer camp owned and operated by Sanborn Western Camps, Inc. (the employer). In mid-summer, the camp supervisors scheduled an "Assistant Counselor Appreciation Day," which included a whitewater rafting trip partially paid for by the employer.

Ordinarily, the employer provided transportation in its vans; however, its vans were not available, and it requested that the counselors use their own vehicles. A supervisor provided a sports utility vehicle driven by her daughter, who was also a counselor. Due to the number of passengers, the plaintiff rode in the space behind the seats, which lacked seatbelts or other passenger restraints. En route, the driver lost control, the vehicle rolled, the plaintiff was ejected, and she suffered a broken neck, leaving her a quadriplegic.

The driver was insured under an automobile liability policy issued to her mother with a $500,000 policy limit (vehicle insurance). The employer was insured under a commercial automobile and general liability policy with a $1 million policy limit (employer's primary insurance policy). In addition, the employer carried a commercial "follow on" umbrella insurance policy issued by the insurer with a $25 million policy limit. This latter policy is at issue here.

After being denied workers' compensation benefits, the plaintiff brought a diversity negligence action against the employer in federal court. The trial court dismissed the action, concluding that her action was barred by state law and her remedies were limited to workers' compensation. The appellate court reversed and remanded the matter to the trial court. See Radil v. Sanborn W. Camps, Inc., 384 F.3d 1220 (10th Cir.2004).

While the plaintiff's personal injury action was pending in federal court, the employer's primary insurer brought this declaratory judgment action against the plaintiff and the employer, seeking a declaration that it was not obligated to defend or indemnify the employer in the federal proceeding. The insurer was joined at the request of the employer, which alleged that the insurer was obligated to provide liability coverage should the employer's primary insurer prevail or should its coverage be exhausted. In addition, the plaintiff filed a cross-claim seeking a declaration that she was entitled to UIM coverage from the insurer. The insurer denied both claims.

Following the reinstatement of her action in federal court, and with the insurer's permission but without the insurer's waiving its position that its policy did not provide UIM benefits to the plaintiff, she settled her claims against the driver for $500,000, the driver's mother's policy limit, and against the employer for the $1 million policy limit under the employer's primary insurance policy. However, she reserved the right to seek UIM benefits from the insurer. Following the settlement, the employer and the insurer stipulated to dismiss this action as between them.

The plaintiff objected to the stipulated dismissal. In response to that objection, the insurer, for the first time, conceded that its policy provided liability coverage to the driver. Further, it argued that the vehicle was not underinsured because aggregating the

vehicle liability coverage, the employer's primary insurer's liability coverage (which the primary insurer denied and which was not resolved or conceded), and the insurer's liability coverage, the driver had $26.5 million in liability coverage, which is in excess of the UIM coverage under the insurer's UM/UIM $25 million policy limit.

Both the plaintiff and the insurer filed motions for summary judgment. The trial court granted the insurer's motion and this appeal followed.

## I. Standard of Review

We review an order granting summary judgment de novo. *Brodeur v. Am. Home Assurance Co.*, 169 P.3d 139, 146 (Colo.2007). Summary judgment is appropriate only when the pleadings, affidavits, depositions, or admissions establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Id.*

We also review the interpretation of insurance contracts de novo. *Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 819 (Colo.2002). Terms contrary to statutory provisions or in violation of public policy are void. *Aetna Cas. & Sur. Co. v. McMichael*, 906 P.2d 92, 100 (Colo.1995). Otherwise, we give contract terms their plain and ordinary meanings and construe ambiguous terms in favor of the insured. *Id.; Hoang v. Assurance Co.*, 149 P.3d 798, 802 (Colo.2007). A term is ambiguous when it is reasonably susceptible of more than one meaning. *Carlisle v. Farmers Ins. Exch.*, 946 P.2d 555, 556 (Colo.App.1997).

Exclusionary language that conflicts with the insured's objectively reasonable expectations is not enforceable. *State Farm Mut. Auto. Ins. Co. v. Nissen*, 851 P.2d 165, 167–68 (Colo.1993). A commonsense analysis of automobile insurance contracts is particularly appropriate because such insurance policies are sold to consumers who are not expected to be highly sophisticated in the art of reading them. *Id.* at 167.

## II. Statutory Requirements

Section 10–4–609, as applicable at the time of the accident and as pertinent here, governed the offering of uninsured and underinsured motorist (UM/UIM) insurance and provided as follows:

(1) (a) No automobile liability or motor vehicle liability policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance, or use of a motor vehicle shall be delivered or issued for delivery in this state ... unless coverage is provided therein or supplemental thereto, in limits for bodily injury or death set forth in section 42–7–103(2), C.R.S., ... for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom; except that the named insured may reject such coverage in writing.

. . . .

(4) Uninsured motorist coverage shall include coverage for damage for bodily injury or death that an insured is legally entitled to collect from the owner or driver of an underinsured motor vehicle. An underinsured motor vehicle is a land motor vehicle, the ownership, maintenance, or use of which is insured or bonded for bodily injury or death at the time of the accident, but the limits of liability for bodily injury or death under such insurance or bonds are:

(a) Less than the limits for uninsured motorist coverage under the insured's policy; or

(b) Reduced by payments to persons other than an insured in the accident to less than the limits of uninsured motorist coverage under the insured's policy.

(5) The maximum liability of the insurer under the uninsured motorist coverage provided shall be the lesser of:

(a) The difference between the limit of uninsured motorist coverage and the amount paid to the insured by or for any person or organization who may be held legally liable for the bodily injury; or

(b) The amount of damages sustained, but not recovered.

Ch. 92, sec. 1, 1983 Colo. Sess. Laws 455, *as amended by* Ch. 51, sec. 4, 1995 Colo. Sess. Laws 143; *cf.* § 10–4–609, C.R.S.2008 (reflecting amendments to subsection (4) and deletion of subsection (5) by Ch. 413, secs. 1 & 2, 2007 Colo. Sess. Laws 1921–22). The statute required insurers to offer their customers the ability to protect themselves from loss caused by negligent and financially irresponsible motorists. *Kral v. Am. Hardware Mut. Ins. Co.*, 784 P.2d 759, 762–63 (Colo. 1989). The statute further permitted an injured insured to recover from an underinsured motorist to the same extent as would occur if the underinsured motorist had no insurance and set the maximum limits of the insurer's · liability relative to the insured's loss. *Id.* Together, the subsections reflected a clear legislative intent to place an injured party with UM/UIM coverage in the same position as if the negligent motorist had been insured to the limits of the UM/UIM coverage.

To determine whether a liable party is underinsured, the statute requires a comparison between the liability limits on policies insuring the tortfeasor's vehicle and the sum of the UM/UIM limits on policies available to the injured party. § 10–4–609(4)(a) (before 2007 amendments); *State Farm Mut. Auto. Ins. Co. v. Progressive Mut. Ins. Co.*, 148 P.3d 117, 121 (Colo.2006).

An insurer may offset against its UM/UIM coverage all liability payments received from tortfeasors, their insurers, and other UM/UIM carriers. *Carlisle*, 946 P.2d at 556. However, an insurer's UIM coverage obligation is not contingent upon the injured party's full recovery under the tortfeasor's policy. § 10–4–609(4), (5) (before 2007 amendments); *State Farm Mut. Auto. Ins. Co. v. Bencomo*, 873 P.2d 47, 50 (Colo.App. 1994). In such cases, an insurer may only offset its UIM coverage obligation by the actual amount the injured party recovers. *State Farm Mut. Auto. Ins. Co. v. Tye*, 931 P.2d 540, 543 (Colo.App.1996).

■ To effectuate the intent of the General Assembly, our supreme court has construed the statute to require every insurer to offer UM/UIM coverage to a class of persons at least as extensive as the class covered under the liability provisions of its policy. *McMichael*, 906 P.2d at 97. An insurer also may not limit UM/UIM coverage by vehicle type. *DeHerrera v. Sentry Ins. Co.*, 30 P.3d 167, 175–76 (Colo.2001); *Bernal v. Lumbermens Mut. Cas. Co.*, 97 P.3d 197, 203 (Colo. App.2003). Insurance policies that fail to meet these requirements are construed to include for the purposes of UM/UIM coverage all persons who would be insured under the contract's liability provisions. *McMichael*, 906 P.2d at 101.

### III. Relevant Policy Provisions

■ The insurer concedes that its insurance policy is a "follow form" policy that adopts the terms and conditions of the primary insurer's policy. *See Black's Law Dictionary* 821 (8th ed.2004). Therefore, the parties agree that the provisions of the employer's primary insurance policy govern the insurer's obligations to provide UIM coverage.

### A. Employer's Primary Insurance UM/UIM Coverage Provisions

The employer contracted for UM/UIM coverage with a specific endorsement to its automobile and commercial and general liability policy. The relevant policy language from that policy stated:

We will pay all sums the "insured" is legally entitled to recover as compensatory damages from the owner or driver of an "uninsured motor vehicle." The damages must result from "bodily injury" sustained by the "insured" caused by an "accident." The owner's or driver's liability for these damages must result from the ownership, maintenance or use of the "uninsured motor vehicle."

The parties agree that the pertinent definition of an "insured" for the purposes of UM/UIM coverage in the employer's primary insurance policy is "anyone [ ] 'occupying' a covered 'auto' or a temporary substitute for a covered 'auto.' The covered 'auto' must be out of service because of its breakdown, repair, servicing, loss or destruction." Under the UM/UIM policy definition, "occupying" means "in, upon, getting in, on, out or off."

A "covered auto" as listed on the policy's declaration page includes only those automobiles owned by the employer.

An "uninsured motor vehicle" is a land motor vehicle or trailer:

(a) For which no liability bond or policy at the time of an "accident" provides at least the amounts required by the applicable law where a covered "auto" is principally garaged.

(b) That is an underinsured motor vehicle. An underinsured motor vehicle means a land motor vehicle or trailer for which the sum of all liability bonds or policies at the time of an "accident" provides at least the amounts required by the applicable law where a covered "auto" is principally garaged, but their limits are:

1. Less than the limit of this coverage, or

2. Reduced by payments to persons other than an "insured" in the "accident" to less than the limit of insurance of this coverage.

(a) For which an insuring or bonding company denies coverage or is or becomes insolvent; or

(b) That is a hit-and-run vehicle and neither the driver nor owner can be identified. The vehicle must hit an "insured," a covered "auto" or a vehicle an "insured" is "occupying."

The parties further agree that the UM/UIM provisions in the employer's primary insurance policy expressly exclude the plaintiff because she was not in a vehicle owned by the employer at the time of the accident, and thus she was not occupying a covered automobile. Additionally, the parties agree that, under the reasoning of *McMichael*, 906 P.2d at 101, and *DeHerrera*, 30 P.3d at 175–76, the covered vehicle restriction violates section 10–4–609, and thus the plaintiff would be covered under the UM/UIM provisions if she was covered under the liability terms of the employer's primary insurance policy.

### B. Liability Coverage Provisions

The relevant policy language defining the employer's primary insurance policy's liability coverage states:

We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or *use* of a covered "auto."

(Emphasis added.)

For liability purposes, the parties agree that the pertinent definition of an "insured" includes "[a]nyone else while using with your permission a covered 'auto' you own, hire or borrow except ... [y]our employee if the covered 'auto' is owned by that employee or a member of his or her household."

The declarations page of the policy identifies the only class of covered autos applicable to this dispute. Those autos are described as "nonowned autos," which are defined as "[o]nly those 'autos' you do not own, lease, hire, rent or borrow that are used in connection with your business. This includes 'autos' owned by your employees or partners or members of their households but only while used in your business or personal affairs." These terms are not in dispute.

The policy expressly exempts from liability coverage any bodily injury to an "employee of the 'insured' arising out of and in the course of employment by the 'insured.'" The policy also states that it does not apply to "'[b]odily injury' to any fellow employee of the 'insured' arising out of and in the course of the fellow employee's employment." These clauses were cited by the employer's primary insurer when it sought a declaration that it was not obligated to defend or indemnify the employer.

### IV. Arguments of the Parties

The parties agreed that if the plaintiff was covered by the liability provisions of the employer's primary insurance policy, she would be an "insured" for purposes of UM/UIM coverage. The parties disagree, however, as to whether the plaintiff was "using" a "covered auto" that the employer "owned, hired, or borrowed." They also disagree concerning whether the vehicle was underinsured within the terms of the insurer's policy.

The trial court concluded that the policy terms defining a "covered auto" were ambig-

uous and must be construed in favor of covering the plaintiff and that if she was insured under the liability provisions, then the driver was also insured. In concluding that the vehicle was not underinsured, the trial court accepted the insurer's argument that the driver or vehicle was insured with liability limits of $26.5 million, which, as we have previously stated, included the insurer's liability coverage which it denied was available in this action.

The plaintiff argues here, as the employer's primary insurer did before the trial court, that the driver was not accorded liability coverage by the employer's primary insurer because that policy specifically excludes from liability coverage an "employee if the covered 'auto' is owned by that employee or a member of his or her household" which is the case here. The plaintiff argues further that liability coverage on the automobile then consisted only of the driver's policy with a limit of $500,000, well below the limit of $25 million provided for UM/UIM coverage by the insurer.

The insurer argues that even if the driver was covered, the plaintiff was not "using" a "covered auto" that was "borrowed" by the employer, and therefore she was not an insured for liability purposes. The insurer argues further that if the plaintiff was insured for liability purposes, then the vehicle had liability coverage totaling $26.5 million, which exceeded its $25 million UM/UIM policy limit.

## V. Analysis

We agree with the trial court that the liability provisions of the employer's primary insurance policy are ambiguous and must be construed in favor of covering the plaintiff. However, we conclude that the vehicle was underinsured, and thus the trial court erred in granting the insurer's motion for summary judgment.

### A. Liability Coverage

If the plaintiff is insured under the liability provisions of the employer's primary insurance policy, then she must be insured for UM/UIM coverage as well. The plaintiff is an insured under the terms of the automobile liability policy if she is "using" a "covered auto" that the employer "owned, hired, or borrowed." She also must use the automobile with permission, which is not disputed here.

### 1. "Using"

The term "using" is not defined in the insurance policy, and therefore we construe it according to its plain and ordinary meaning. *Hoang*, 149 P.3d at 801; *Gulf Ins. Co. v. State*, 43 Colo.App. 360, 363, 607 P.2d 1016, 1018 (1979). "When determining the meaning of the term 'use' in an automobile insurance policy, a court must examine the factual circumstances of each case, including the particular characteristics of the vehicle and the intention of the parties to the contract." *Mid–Century Ins. Co. v. Heritage Drug, Ltd.*, 3 P.3d 461, 463 (Colo. App.1999). "Although, in general, operation of a motor vehicle for transportation purposes would constitute use, our jurisprudence demonstrates that 'use' may have a broader meaning." *McMichael*, 906 P.2d at 101–02 (plaintiff was "using" a truck when it was a barricade with overhead beacon and emergency flashers operating to protect him while working on the road).

The plaintiff argues that she could have been "using" the vehicle as a passenger for purposes of liability coverage if she used the vehicle as a platform from which to commit a tort in which case she would have been an insured under the liability provisions of the policy. The insurer argues that, for liability coverage, "using" means operating or having direct supervisory control over a vehicle. We agree with the plaintiff.

"Use" means "the application or employment of something." *Black's* at 1577. An "automobile" is "usually a 4–wheeled automotive vehicle designed for passenger transportation on streets and roadways." *Webster's Third New International Dictionary* 148 (2002). Thus, "using" an "automobile" means employing it for passenger transportation. In these common definitions we find no requirement that the "user" operate or supervise the operation of the vehicle.

In *Cung La v. State Farm Auto. Ins. Co.*, 830 P.2d 1007, 1009 (Colo.1992), our supreme court concluded that injuries arose from the "use" of an automobile when a passenger riding in an uninsured vehicle shot the victim. The court stated:

> The assailant's use of a firearm to shoot the [victim] does not preclude the [victim's] resulting injuries from having arisen out of the use of the uninsured motor vehicle if that vehicle contributed to the injuries and the injuries would not have been sustained *but for the assailant's use* of the uninsured vehicle.

*Id.* (emphasis added).

Other courts have stated more directly that a passenger committing a tort while riding in a vehicle is using the vehicle for purposes of automobile liability coverage. *Wyo. Farm Bureau Mut. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 467 F.2d 990, 993 (10th Cir.1972) (liability policy covered passenger who threw vodka bottle out vehicle's window); *Nat'l Am. Ins. Co. v. Ins. Co. of N. Am.* 74 Cal.App.3d 565, 140 Cal.Rptr. 828, 832 (1977) (passenger who threw egg from car was using it for liability purposes); *Grange Mut. Cas. Co. v. Rosko*, 146 Ohio App.3d 698, 767 N.E.2d 1225, 1231 (2001) (passenger who grabbed steering wheel from driver was using the vehicle for purposes of liability coverage); *U.S. Fire Ins. Co. v. United Serv. Auto. Ass'n*, 772 S.W.2d 218, 221 (Tex.App.1989) (same); *State Farm Mut. Auto. Ins. Co. v. Allstate Ins. Co.*, 154 W.Va. 448, 175 S.E.2d 478, 481 (1970) ("[i]t is perfectly clear that an automobile is being used by an individual who is traveling in it").

We are not persuaded by those cases relied upon by the insurer for the proposition that "users" must operate or control vehicles to have liability coverage. First, in *Francis–Newell v. Prudential Ins. Co.*, 841 S.W.2d 812, 814 (Mo.Ct.App.1992), the court held that a passenger injured in a vehicle was using it and stated that "[t]he weight of authority from other jurisdictions supports the proposition that passengers are users of a motor vehicle." *Id.* (quoting *Sears v. Grange Ins. Ass'n*, 111 Wash.2d 636, 762 P.2d 1141, 1142 (1988) (collecting cases), *overruled by Butzberger v. Foster*, 151

Wash.2d 396, 89 P.3d 689 (2004)). Therefore, *Francis–Newell* supports the plaintiff, not the insurer. Nor are we persuaded by the insurer's remaining authority, which deals with injured persons who were not in the covered vehicles at the time of their injury. *See, e.g., North Star Mut. Ins. Co. v. Raincloud*, 563 N.W.2d 270, 273 (Minn.Ct.App. 1997) (child was not "using" vehicle when she allowed her mother to drive it away); *Greentree Assocs. v. U.S. Fid. & Guar. Co.*, 256 N.J.Super. 382, 607 A.2d 175, 178 (App.Div. 1992) (general contractor not "using" subcontractor's vehicle when supervising job site).

The best that can be said for the insurer's authorities is that they demonstrate the term "using" is broad and ambiguous. In that sense, it is reasonable to conclude that a passenger is "using" a vehicle for transportation when he or she is riding in it. It is also reasonable to assume that the employer intended to be insured when its employees or campers accidentally caused damage to third parties while riding as passengers in its covered vehicles.

The employer's primary insurer could have used the terms "operating," "supervising," or "controlling" instead of the term "using" if it intended to restrict the class of insured persons. And the primary insurer did just that in defining the term "use" with respect to an automobile exclusion in its commercial general liability policy. There, the policy excluded claims arising out of the "use" of any "auto" owned by, operated by, rented by, or loaned to an insured. Following that declaration, the employer's primary insurance policy defined the term "use" by stating, "Use includes operation and 'loading or unloading.' "

Therefore, because the policy employed such a broad term without defining it for the purpose of limiting the insured persons, and for other purposes elsewhere narrowly defined the term, we must interpret the term in favor of coverage. We thus conclude that the plaintiff was using the vehicle when she was riding in it.

### 2. A "Borrowed" and "Covered Auto"

To be covered for liability purposes, the plaintiff, as a passenger, must have been

using a "covered auto" that the employer owned, hired, or borrowed.

In its amended complaint, the employer's primary insurer admitted that the vehicle involved in the accident was "borrowed" by the employer when its vans were unavailable. The parties agree that the only relevant "covered auto" designation on the declaration page is that of a "nonowned auto." However, the first sentence of the "nonowned auto" definition states that such autos are those that the employer "do[es] *not* own, lease, hire, rent or *borrow* that are used in connection with [its] business." (Emphasis added.)

The insurer argues, as did the employer's primary insurer in the trial court, that the plaintiff could not be insured because the vehicle in which she was injured cannot be simultaneously borrowed and not borrowed. The trial court found the provision ambiguous and construed the policy language in favor of coverage.

 We agree with the trial court and find further support for this conclusion from the fact that "nonowned autos" were included in the list of vehicle types for which a liability premium was expressly designated on the declarations page of the policy. If a vehicle must be owned, hired, or borrowed to be covered for liability purposes and yet a non-owned automobile by definition cannot be owned, hired, or borrowed, then it would be impossible to cover a nonowned automobile and the declarations page would be meaningless in that regard. In that event, the employer would have paid designated premiums without being accorded any coverage. Construing the insurance policy like a reasonable person of ordinary intelligence would do, so that all provisions are harmonious and meaningful, and resolving ambiguities in favor of coverage, we must conclude that the plaintiff was using a covered automobile that was borrowed by the employer. *See Progressive Specialty Ins. Co. v. Hartford Underwriters Ins. Co.,* 148 P.3d 470, 474 (Colo.App.2006); *Hoang,* 149 P.3d at 802. Therefore, the plaintiff was using a borrowed and covered auto and must be considered an "insured" for purposes of UM/UIM coverage.

**B. UM/UIM Coverage**

The plaintiff is then entitled to UM/UIM benefits if the vehicle was uninsured or underinsured. Because the driver was insured under the vehicle's policy, the vehicle cannot be considered uninsured, but may be underinsured under the terms of the employer's primary insurance policy.

The pertinent definition of an underinsured vehicle in the employer's primary insurance policy aligns with the definition in former section 10–4–609, that is, a vehicle is underinsured when the total of its liability coverage limits is less than the total of the UIM coverage limits applicable to the insured. *See Progressive Mut. Ins. Co.,* 148 P.3d at 121. The policy language allows for the summation of all available liability coverages on the vehicle when making the comparison to the UIM coverage limits. The statute does not preclude summation.

The trial court concluded that because the plaintiff was covered by the employer's primary insurance policy, the driver was as well. It then concluded that the sum of the liability coverages including the vehicle's liability limit, the employer's primary insurer's liability limit, and the insurer's umbrella liability limit exceeded the amount of UIM coverage, and therefore the vehicle was not underinsured.

 However, the trial court erred in concluding that because the plaintiff was covered for liability purposes under the employer's primary insurance, the driver was as well. The policy language describing liability coverage in that policy states that the insurer will "pay all sums an 'insured' legally must pay as damages because of 'bodily injury.'" Then, in defining who is an insured, the policy specifically excludes "[y]our employee if the covered 'auto' is owned by that employee or a member of his or her household." Thus, the driver was not an "insured" under the employer's primary insurance policy when she drove her mother's vehicle, and therefore, in our view, the employer's primary insurer had no obligation to pay for damages caused by the driver's negligence. As indicated, the employer's primary insurer, while paying policy limits, denied liability coverage for the driver based on this express exclusion. The employer's primary insurer

also denied liability coverage under its commercial general liability policy because it excluded coverage for injuries arising out of the use of an automobile loaned to the employer.

Given the policy exclusions and the employer's primary insurer's denials of coverage, we cannot conclude that the vehicle or the driver was insured for the limits of the employer's primary insurance policy and, therefore, the insurer's liability coverage. In some circumstances these limits would be available for liability coverage, for example, if an employee other than the driver's mother or a member of her family had been driving the vehicle. Here, however, the employer's primary insurance policy was written to preclude coverage when it could be provided through other insurers, such as workers' compensation carriers and the employer's employees driving their own vehicles. Thus, because the driver had her own liability coverage under the vehicle insurance, the employer's primary insurance policy did not provide that coverage to the driver.

The insurer would have us consider the liability coverage on the vehicle regardless of the circumstances of the accident. The problem with the insurer's approach is that it does not allow for the apportionment of fault. Where a potential tortfeasor has a high liability limit but very little or no fault, a mechanical addition of liability limits would impute an illusory benefit to the injured person. The high limit would preclude a finding that the vehicle is underinsured, but the low or no proportion of fault would ensure that the insured will be unable to obtain appropriate compensation for her injuries. *See Colonial Penn. Ins. Co. v. Salti,* 84 A.D.2d 350, 446 N.Y.S.2d 77, 79–80 (1982); *Mulholland v. State Farm Mut. Auto. Ins. Co.,* 171 Ill. App.3d 600, 122 Ill.Dec. 657, 527 N.E.2d 29, 36 (1988).

This puts the injured person in a worse position than if the vehicle had no insurance whatsoever. Such a result runs contrary to the intent of the General Assembly that added the underinsured motorist provision to the statute. *See Shelter Mut. Ins. Co. v. Thompson,* 852 P.2d 459, 463 (Colo.1993). Therefore, because the automobile liability limits of the employer's primary insurance policy and

the insurer's umbrella policy were not actually available for the driver's negligence in this accident, the total amount of liability insurance for purposes of UIM coverage was only the $500,000 limit of the policy insuring the vehicle.

Yet, notwithstanding its denials of liability and insurance coverage, the employer's primary insurer paid its policy limit in an approved settlement between the employer and the plaintiff. The insurer argues that this indicates the full amount of liability coverage from both the employer's primary insurer's and the insurer's policies were available to the plaintiff. The insurer argues further that it should not be liable for an underinsured motorist claim when the plaintiff had the ability to negotiate for the full amount of liability coverage and voluntarily settled for less than the full amount of coverage.

We find these circumstances analogous to those of the plaintiff in *Tye,* 931 P.2d 540. There, the plaintiff settled with the tortfeasor with the insurer's permission for less than the full amount of liability coverage and sought the remainder of his damages from his UIM carrier. *Id.* at 541–42. The carrier sought to offset from its UIM obligation the total liability limit of the tortfeasor's coverage rather than only the amount paid in settlement. *Id.* The division of this court in *Tye* concluded that a "settlement made in good faith and approved by the underinsured motorist carrier should not preclude an insured from seeking full compensation." *Id.* at 543.

Here, the plaintiff settled her claim against the employer, with both the employer's primary insurer's and the insurer's permission, for the $1 million limit of the employer's primary insurance policy. She expressly reserved her right to then seek UIM coverage from the insurer. The plaintiff should not be penalized for settling in good faith with the approval of the insurer only to find that the insurer may then use that settlement against her to deny coverage.

Finally, we conclude that it would be incongruous to allow the insurer to use the policy limits of its policy to deny UIM coverage to the plaintiff. Under the terms of the

policy, a vehicle is uninsured when an insurance carrier denies coverage. Here, the insurer denied its liability coverage but claims that because the vehicle was covered by the driver's automobile insurance policy, the vehicle could not be uninsured. Again, this places the plaintiff in a worse position than if the driver had been uninsured. If the driver had been uninsured and the insurer had denied liability coverage, then the vehicle would by definition be uninsured and the full $25 million limit of the UM/UIM insurance policy would have been available to her. However, because the driver had $500,000 in liability insurance, the insurer cannot deny its liability coverage and then use that coverage to claim that the vehicle was not underinsured.

We find these circumstances analogous to those in *Nissen*, 851 P.2d 165, where the plaintiff was injured when she tried to prevent a thief from stealing her car. *Id.* at 166. She first sought benefits under her vehicle's liability policy, which the insurer denied because the thief was a non-permissive driver. *Id.* She then sought benefits under her vehicle's UM/UIM policy provisions, which the insurer denied because it insured her car for liability purposes. *Id.* There, the plaintiff argued that because the insurer denied liability coverage, her vehicle was uninsured pursuant to a similar policy definition as discussed here. *Id.* at 167. That court concluded that the insurer's denial of liability coverage rendered the vehicle uninsured under the policy definitions. *Id.* at 169. The court also concluded that its construction of the policy was supported by the legislative intent underlying the UM/UIM statute and stated that the plaintiff "is clearly within the class of persons that the statute intended to protect. She opted to purchase uninsured motorist coverage, and she was injured by an uninsured motorist driving a car which became uninsured at the time of the accident because of [the insurer's] denial of liability coverage." *Id.* at 168.

Here, the employer presumably purchased UM/UIM coverage from its primary insurer and the insurer to protect its employees and passengers when injured by uninsured or underinsured motorists. The driver was covered by the vehicle insurance. However, both insurers denied any other liability coverage because she was driving a privately owned vehicle. These denials effectively made the vehicle underinsured. Therefore, for the reasons stated above, the liability policy limits of the employer's primary insurance policy and the insurer's policy were not available at the time of the accident and cannot be used to calculate whether the driver's vehicle was underinsured.

The insurer further argues that it provided liability coverage for the vehicle independently of the employer's primary insurance policy, and thus its liability policy limits must be considered independently in the equation. However, the primary insurer and the insurer specifically denied liability coverage on account of the driver's status. Therefore, we conclude that the only liability coverage available was that of the driver through the vehicle insurance, which is far below the $25 million limit of the insurer's UIM policy.

While the insurer is entitled to credit for the vehicle insurance and the employer's primary insurance policy payments, we cannot assume that the settlement with the employer for the limit of its primary insurance policy is any indication of liability coverage for the vehicle by that insurer. The employer denied any liability in the settlement agreement, and there is no indication in the record as to the basis for the settlement, other than the desire to avoid further litigation. This payment then falls under former section 10–4–609(5) as separate compensation that should be subtracted from the total UIM payments made, but not under former section 10–4–609(4) as a form of available liability insurance. Therefore, we conclude that the trial court erred in granting summary judgment to the insurer. The plaintiff is entitled to UIM benefits under the insurer's policy.

The judgment is vacated and the case remanded for further proceedings consistent with this opinion.

Judge WEBB and Judge HAWTHORNE concur.